| | |
|---|---|
| MOHAMMAD I. IBRAHIM, )<br>　　　Plaintiff, )<br> )<br>　　v. )<br> )<br>UNITED STATES STEEL CORP.; )<br>UNITED STEEL WORKERS, LOCAL 1014; and )<br>UNITED STEEL, PAPER AND FORESTRY, )<br>RUBBER, MANUFACTURING, ENERGY, )<br>ALLIED INDUSTRIAL AND SERVICE )<br>WORKERS INTERNATIONAL UNION )<br>　　　Defendants. ) | CAUSE NO.: 2:10-CV-455-PRC |

## OPINION AND ORDER

This matter is before the Court on (1) the Union Defendants' Motion for Summary Judgment [DE 23], filed on April 2, 2012, by Defendant United Steelworkers, Local 1014 ("Local 1014") and Defendant United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union ("USW") (collectively "the Union"), (2) the Motion for Summary Judgment of United States Steel Corporation [DE 24], filed on April 2, 2012, by United States Steel Corporation ("U.S. Steel"), and (3) Union Defendants' Motion to Strike Plaintiff's Response to Union Defendants' Motion for Summary Judgment [DE 37], filed by the Union on May 18, 2012.

## PROCEDURAL BACKGROUND

On November 15, 2010, Plaintiff Mohammad Ibrahim filed a Complaint, alleging that the Union breached its duty of fair representation and that U.S. Steel breached its labor contract. U.S. Steel filed an Answer on December 14, 2010, and the Union filed its Answer on January 10, 2011.

1

On April 2, 2012, the Defendants filed the instant Motions for Summary Judgment. On May 15, 2012, Plaintiff filed a response to each Defendant's motion, and on May 29, 2012 each Defendant filed a reply to Plaintiff's responses. On May 28, 2012, the Union filed its Motion to Strike. Plaintiff has not filed a response to the Motion to Strike, and the time to do so has passed.

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case; therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c) and 42 U.S.C. § 405(g). As a result, the case was reassigned to the undersigned Magistrate Judge on March 2, 2011.

## STANDARD OF REVIEW

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)). "[S]ummary judgment is appropriate – in fact, is mandated – where there are no disputed issues of material fact and the movant must prevail as a matter of law. In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotations omitted).

A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323; Fed. R. Civ. P. 56(c). The moving party may discharge its initial responsibility by simply "'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. When the nonmoving party would have the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Celotex*, 477 U.S. at 323, 325; *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 n.3 (7th Cir. 1994); *Fitzpatrick v. Catholic Bishop of Chi.*, 916 F.2d 1254, 1256 (7th Cir. 1990). However, the moving party, if it chooses, may support its motion for summary judgment with affidavits or other materials, and, if the moving party has "produced sufficient evidence to support a conclusion that there are no genuine issues for trial," then the burden shifts to the nonmoving party to show that an issue of material fact exists. *Becker v. Tenenbaum-Hill Assoc.*, 914 F.2d 107, 110-111 (7th Cir. 1990) (citations omitted); *see also Hong v. Children's Mem'l Hosp.*, 993 F.2d 1257, 1261 (7th Cir. 1993).

Once a properly supported motion for summary judgment is made, the non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings. *See* Fed. R. Civ. P. 56(e); *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994). Rule 56(e) provides that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion [or] grant summary judgment if the motion and supporting

materials – including the facts considered undisputed – show that the movant is entitled to it . . . ." Fed. R. Civ. P. 56(e)(2), (3); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986). Thus, to demonstrate a genuine issue of fact, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," but must "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis in original).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences in favor of that party. *See Anderson*, 477 U.S. at 255; *Srail v. Vill. of Lisle*, 588 F.3d 940, 948 (7th Cir. 2009); *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *See Anderson*, 477 U.S. at 249-50.

## MATERIAL FACTS[1]

### A. The Basic Labor Agreement Between the Union and U.S. Steel

U.S. Steel's production and maintenance employees work under a Basic Labor Agreement ("BLA"), the current version of which has been in effect since September 1, 2008. The BLA provides, among other things, that the Union serves as the exclusive representative of a bargaining unit for the covered employees. The management rights clause of the BLA provides that U.S. Steel retains the "exclusive rights to manage the business," which include the "right to hire, suspend or discharge for proper cause, or transfer, and the right to relieve employees from duty because of lack

---

[1] In compiling the Material Facts, the Court has considered the arguments made in Plaintiff's Statement of Genuine Disputes and has only included facts supported by the cited evidence of record.

of work or for other legitimate reasons." Union Br., Ex. A., p. 98. The "Hours of Work" section of the BLA contains a policy on absenteeism, providing that "[it] is expected that Employees shall adhere to their schedule. When an Employee has just cause to be late for or absent from work, s/he shall, as promptly as possible, contact the designated person and provide the pertinent facts and when the Employee expects to return to work." *Id*. at p. 64.

The BLA's "Suspension and Discharge Procedure" section provides that "[a]n Employee shall not be peremptorily discharged." *Id*. at p. 92. If U.S. Steel concludes that an employee's conduct warrants suspension or discharge, it must first give the employee written notice of suspension of no greater than five days in length. *Id*. U.S. Steel's General Safety and Plant Conduct Rules and Regulations booklet provides a list of offenses that may be cause for suspension preliminary to discharge. Union Br., Ex. B., pp. 14-15. The list includes, among others, the following pertinent offenses:

> 5.  Falsifying or refusing to give testimony when accidents are being investigated; or falsifying or assisting in falsification of personnel records, or any other records; or giving false information in making application for employment.
>
> . . .
>
> 7.  Absence from duty without notice to, and permission from, supervisor or other designated person, except in case of sickness or cause beyond the employee's control of a nature that prevents his/her giving notice.

Union Br., Ex. B., p. 14.

During the five-day suspension, the employee can "request and shall be granted, during this period, a preliminary hearing and a statement of the offense." Union Br., Ex. A, p. 92. After the preliminary hearing, known as a 9(b) hearing, or if no hearing is requested, U.S. Steel may "affirm, revoke, extend, or modify the suspension or convert the suspension to a discharge." *Id*. at p. 93.

5

In response, the employee "may file a grievance directly to Step 2," and if the employee chooses to do so, the grievance will thereafter be processed in accordance with the regular grievance procedure. *Id.* The grievance and arbitration procedure described in the BLA is a multi-step process through which differences about the "interpretation or application of, or compliance with, the provisions of [the BLA] or any other Agreement between [U.S. Steel] and the Union" can be resolved. *Id*. at p. 80. Unless it is withdrawn or settled, a grievance culminates in an arbitration hearing. At each step, the Union and U.S. Steel hold a meeting to discuss each party's position on the grievance. Once the Union receives U.S. Steel's decision to grant or deny the grievance at each step, the Union has a time period in which to appeal the grievance to the next step.

If the employee files a grievance to step two, the grievance committee will hold a meeting to grant or deny the grievance after considering facts, background information, testimony, and past grievances or arbitration awards. *Id*. at p. 83. Within five days of the step two meeting, the department head provides the Grievance Chair with a written response to the grievance. If the Union rejects U.S. Steel's answer, U.S. Steel provides the Grievance Chair with the step two minutes for the grievance.

Step three is the first step in the grievance procedure in which a USW representative becomes involved in the appeal process. In this case, the USW staff representative was Alexander Jacque. At this step, the USW representative files a written appeal of the step two decision, which results in a written answer from U.S. Steel.

Finally, the BLA provides that, if the employee and the Union are unsatisfied with the decision rendered at step three, the Union representative may appeal the grievance to arbitration. In preparation for an arbitration hearing, the Union and U.S. Steel each file a pre-hearing brief "in

accordance with current practices." *Id*. at p. 91. At the Gary Works location where Plaintiff worked, the practice is to file pre-hearing briefs two weeks before the scheduled arbitration hearing.

### B. Plaintiff's Employment, Absences, and Resulting Discipline

U.S. Steel hired Plaintiff on February 21, 2005. That day, Plaintiff signed a form acknowledging that he understood that he was required to abide by U.S. Steel's "General Safety and Plant Conduct Rules and Regulations and General Safety Rules-Office Personnel booklet," the "Basic Labor Agreement between USS and the United Steelworkers of America" ("BLA"), and other documents.

On August 19, 2006, Plaintiff received a five-day suspension for failure to "seal up #1 lid." Union Br., Exh. D. On July 10, 2007, Plaintiff received a written warning for being tardy for line up. On December 5, 2007, Plaintiff received a five-day suspension for being absent without just cause. On April 24, 2009, Plaintiff received a five-day suspension for being tardy for line up. No grievances were filed in protest of these suspensions or the written warning.

Plaintiff did not report to work on July 20, 2009, through July 23, 2009, due to personal illness. On July 20, 2009, Plaintiff awoke feeling ill and called off work. On July 22, 2009, Plaintiff went to his doctor, Dr. Ibrahim Zabaneh, where it was noted in his records that Plaintiff's chief complaint was congestion and sneezing, he had a sore throat and a cough, and he was diagnosed with sinusitis. That same day, Dr. Zabaneh provided Plaintiff with a "Return to Work Note," indicating in the "Illness or injury" line that Plaintiff was "under Dr.'s care." The note provided that Plaintiff was "Under care from: 7-20-09 to:7-22-09." Union Br., Exh. F. In the "Comments" section was written "unable to work." The note gave a return to work date of July 23, 2009, the following day.

On July 23, 2009, Plaintiff did not return to work. Rather, Plaintiff returned to work on July 24, 2009, and submitted the July 22, 2009 Return to Work note from Dr. Zabaneh with the last date "Under care" altered from "7-22-09" to "7-23-09" and with the "Return to work on" date changed from "7-23-09" to "7-24-09." Union Br., Exh. G. Plaintiff made the alterations. U.S. Steel contacted Community Healthcare Systems and requested that they send the original Return to Work note, which they did.

On July 28, 2009, U.S. Steel representative Sandra Armstrong issued Plaintiff a Discipline Notice for being absent without just cause, giving him a five-day suspension, and issued Plaintiff a second Discipline Notice for providing false documentation, giving him a second but concurrent five-day suspension.

On July 31, 2009, a preliminary 9(b) hearing was held for both offenses. Present for the hearing were Armstrong, Plaintiff, and Pat Clem (a union representative). The handwritten notes provide that, at the hearing, Armstrong identified the two offenses, noted Plaintiff's four and a half years of service, and recognized that the Return to Work note had been altered. The hearing notes further provide that Plaintiff stated that the change to the Return to Work note was authorized by the doctor, that he had obtained a new note, and that he presented that note. The new Return to Work note from Dr. Zabaneh is dated July 29, 2009, provides that he was under his doctor's care from July 20-23, 2009, and that he was able to return to work on July 24, 2009, and indicates in the "Comments" section: "unable to work - pt. was still sick on the 23rd & was authorized to extend days off by one day." Union Br., Exh. J. The notes from the July 31, 2009 hearing provide that Plaintiff stated that he called the doctor on July 23, 2009, to say he was still sick and that he was

cleared for another day.  When asked what was wrong, he stated that he had been dizzy and did not want to operate the machinery.

On August 3, 2009, Plaintiff's suspensions were converted to a discharge.

On August 6, 2009, the Union filed two grievances in protest of Plaintiff's discharge, one for U.S. Steel's decision that Plaintiff was absent without just cause and the other for U.S. Steel's decision that Plaintiff provided false information.  The grievances were considered simultaneously throughout the grievance procedure.  The "Union Record" provided that the Union's understanding of the facts was that Plaintiff "provided management with a valid doctor's excuse covering the days of absence.  Additional information was also applied with the doctor's permission.  The Union contended that management had violated the BLA and requested that Plaintiff's suspension and discharge be removed from his record, that Plaintiff be returned to work, and that Plaintiff be made whole for any losses.

On August 10, 2009, the Union appealed the grievances to step two of the grievance procedure.  A step two meeting was held on August 12, 2009, attended by Plaintiff, Armstrong, Clem, and E. Peterson who was the chairman of Local 1014's grievance committee.  The minutes of the step two hearing summarize the facts of Plaintiff's discharge that were discussed, including that Plaintiff reported off work for personal illness from July 20-23, 2009; that when he returned to work on July 24, 2009, he submitted an altered note from Dr. Zabaneh to justify his absence; that U.S. Steel contacted Dr. Zabaneh's office and requested a copy of the original, unaltered note; and that Plaintiff submitted an additional note from Dr. Zabaneh stating that he was able to return to work on July 24, 2009.  The minutes also summarize the July 31, 2009 9(b) hearing and provide that U.S. Steel had obtained Plaintiff's medical records for further review.  The minutes provide that the

"medical record . . . stated that [Plaintiff] did not see the doctor until 07/22/2009, which is two days after he started to call off work. It also stated that [Plaintiff] was congested and sneezing. Grievant's Pulse was 80; his blood pressure was 110/80, and his temperature 98.1 which are all normal." Union Br., Exh. M., pp. 1-2. The minutes also summarize Plaintiff's explanation that "he was too sick to go to the doctor on the 20 or 21st and that when he went to the doctor on the[sic] 07/22 he was feeling better that was the reason all his vitals were normal. But then he also stated that he[sic] too sick to come to work on the 23rd." *Id.* at p. 2. The minutes further provide that Plaintiff "stated that he called the doctor's office on either [sic] 22nd or 23rd and told them that he was still sick. He stated that the doctor's office gave him permission to change the doctor's note excusing him for one more day." *Id.* When asked for phone records to show the call to the doctor's office, Plaintiff did not know what phone he had called from and could not remember what day he had called the office. Plaintiff also stated that he was too sick on July 20, 2009, and July 21, 2009, to go to the doctor.

In addition, the step two hearing minutes include U.S. Steel's argument that Plaintiff had "reported off work for four days and failed to substantiate his need to be off work." Union Br., Exh. M., p. 4. U.S. Steel argued:

> [Plaintiff] did not go to the doctor until the 22nd at which time all his vitals were normal. The original doctor's note stated that [Plaintiff] was under his care since the 20th is not the case. The doctor can not certify that the [Plaintiff] was sick when he was not seen by him until the 22nd. [Plaintiff] stated . . . that he was feeling much better on the 22nd that was why his vital signs were normal. If that were the case then why did he need to report off on the 23rd? [Plaintiff] stated that he called the doctor and got permission to stay off another day is very questionable. [U.S. Steel] requested [Plaintiff]'s phone records and [Plaintiff] could not remember what day he called or what phone he called from and he refused to provide any record to [U.S. Steel]. He stated that he was so sick he could not remember. Even though [Plaintiff] presented another note from the doctor stating that he was authorized to extend days off by one day it is still not acceptable to change a doctors note. [Plaintiff] should

have gone back to the doctor and had him write a new note. This is clearly a case where [Plaintiff] reported off work for four days and failed to substantiate his need to be off work. [Plaintiff] admitted his[sic] altered the return to work note which is a violation of General Plant and Safety Conduct Rules.

Union Br., Exh. M, p. 3-4.

The Grievance Committee denied Plaintiff's grievances at step two. The step two minutes were issued on August 25, 2009. The Union, by Pat Clem, filed exceptions to the step two minutes on September 21, 2009, which provided in its entirety: "Grievant, M. Ibrahim, 60-081, stated that he could not get out of bed with all the pain that was in his ear, nor could he get into his doctor's office until 7-22-09." Union Br., Exh. N.

After the second-step meeting occurred, but before the minutes of the meeting had been issued, Plaintiff spoke with USW Staff Representative Alexander Jacque about the grievances related to his discharge. Jacque has been processing grievances since 1973. After hearing Plaintiff's version of the events, Jacque told Plaintiff he would have to review the step two minutes before making a decision about an appeal. After reviewing the minutes, Jacque explained to Plaintiff that he felt the grievances did not have merit based on Plaintiff's short term of service, the circumstances of his discharge, and his work and disciplinary history. Jacque further explained that he believed it would come down to a question of credibility as to whether the arbitrator would believe that Plaintiff was too sick to go to the doctor on July 23. Jacque stated that Plaintiff told him he could provide him with more evidence.

On September 24, 2009, Jacque wrote U.S. Steel to appeal Plaintiff's grievances to step three. Plaintiff's grievances were again denied after the third step meeting on February 5, 2010. The Union rejected that decision.

As a result, Jacque appealed the grievances to the Board of Arbitration on March 9, 2010, contending that U.S. Steel violated Article 5, Section J of the 2008 BLA. In his Declaration, Jacque indicated that he initially appealed Plaintiff's grievances to arbitration to obtain more time to fully investigate the matter and to allow Plaintiff time to produce additional evidence before the time limit passed.

Both the Union and U.S. Steel filed pre-hearing briefs two weeks prior to the arbitration hearing according to the local practice. In his brief, Jacque argued (1) that Plaintiff had permission to change the Return to Work note he received from his doctor, and, therefore, Plaintiff did not provide false information when he submitted the note and (2) that his absence was justified. Jacque attached exhibits to the brief, including the original July 23, 2009 Return to Work Note, the Return to Work Note that Plaintiff had altered, a note from Plaintiff's doctor authorizing the change in the Return to Work date, Plaintiff's HIPAA form, and a telephone record from Plaintiff's friend Curtis Williams showing that Plaintiff called his doctor's office on July 23, 2009. Jacque also cited two arbitration awards in the brief.[2]

Jacque states in his Declaration that, after he filed the Union's pre-hearing brief, he received a call from U.S. Steel attorney Nicole Callahan questioning why he was pursuing Plaintiff's grievances. Callahan provided him with two past arbitration decisions with similar facts in which

---

[2] In Paragraph 8 of the Statement of Genuine Disputes, Plaintiff correctly notes that the Union did not attach Exhibit DD to its submission of evidence filed with its Motion for Summary Judgment. Exhibit DD is one of the two arbitration decisions initially cited by Jacque. A review of the Union's exhibits shows that Exhibit DD was not separately filed but that approximately the second half of Exhibit DD appears to have been attached at the end of Exhibit CC.

In response to Plaintiff's Statement of Genuine Disputes, the Union submitted Exhibit DD as an attachment to its Reply Brief. Because it was not submitted in support of the opening motion and because no leave was sought to have it considered, the Court will not consider Exhibit DD. However, as the Union argues, the arbitration award at Exhibit DD itself is unnecessary, as the material fact is Jacque's belief as to why he felt that the arbitration awards cited by Callahan were more persuasive, which is contained in paragraph 13 of Jacque's Declaration.

the employee's discharge was upheld. Jacque told Callahan that they would argue that Plaintiff had authorization from his doctor to take another day before returning to work. Jacque states that Callahan responded that U.S. Steel would argue that Plaintiff's doctor could not have made that determination without examining Plaintiff in person, which he did not do. Callahan also represented that U.S. Steel would question the first two days of Plaintiff's absence and why Plaintiff did not go to a doctor until the third day of his illness. Finally, Callahan stated that U.S. Steel would argue that the symptoms listed on the notes were not severe enough to justify Plaintiff's absences from work.

Although Plaintiff told Jacque that his wife and three other people were at his house during the days he was sick and that he could produce them as witnesses, Plaintiff only produced one friend, Curtis Williams. Plaintiff told Jacque that he had used Williams' cell phone on July 23, 2009, to call his doctor's office, and Plaintiff produced William's cell phone records showing that a call had been made from William's phone to Dr. Zabaneh's office on July 23, 2009. However, Jacque stated in his Declaration that there was no way to prove that Plaintiff made that call. Plaintiff also produced a third Return to Work note, which was filled out by Dr. Zabaneh on November 17, 2009, and provided that Plaintiff was unable to work between July 20, 2009, and July 23, 2009, because of "sinusitis, dizziness, and congestion." Union Br., Ex. P. In his Declaration, Jacque stated that the November 17, 2009 note listed different symptoms than the notes from July 2009.

In his Declaration, Jacque explains that he met with Plaintiff and Williams. Jacque asked Plaintiff why he did not go to the doctor when he first got sick, and Plaintiff responded that he was too sick to go to the doctor or the emergency room. Plaintiff explained that he had three people at his house because his friends were checking in on him. Jacque states that Plaintiff told him that he felt "pretty good" on July 22 but woke up feeling a "little bad" on July 23, which is why he called

the doctor to change the Return to Work note. Union Br., Exh. W, ¶ 11. Jacque states in his Declaration that he "felt [Plaintiff] would make a poor witness at an arbitration hearing because his explanations of his actions did not make sense and were not believable." *Id.* Jacque states that he felt that Williams would also make a poor witness because he thought "Williams came to the meeting drunk. I smelled alcohol on Williams's breath." *Id.* At that meeting, Jacque told Plaintiff that he was going to withdraw the grievances and that he would be sending Plaintiff a letter stating that he had decided to withdraw the grievances.

After conducting several interviews with Plaintiff, considering the evidence, considering the arbitration awards in other cases provided by Callahan, and discussing the case with Michael Millsap (who also works for USW and is a Sub-District Director in District 7 and who agreed that Plaintiff's grievances did not have merit), Jacque determined that the likelihood of success at arbitration was minimal.

In his Declaration, Jacque provides the following seven reasons why he believed Plaintiff's grievances lacked merit. First, U.S. Steel has a zero-tolerance policy for absences without cause; Plaintiff should have gone to the doctor the first day he was off work; and the fact that he waited until the third day to do so made it difficult to show that his absences were justified. Second, although the doctor cleared Plaintiff to return to work on July 23, 2009, Plaintiff decided he did not feel well enough and called the doctor's office to be authorized to return to work a day later; however, there is no way to prove that Plaintiff made the call from Williams' phone. Third, even if Dr. Zabaneh authorized Plaintiff to alter the note, it did not justify Plaintiff's July 23, 2009 absence from work because Dr. Zabaneh did not examine Plaintiff on July 23, 2009. Fourth, Jacque felt the listed symptoms in the documents from Dr. Zabaneh's office may not have been severe

enough to justify three days' absence from work, and felt that the notes were less credible because the symptoms varied between notes. Fifth, Plaintiff had a history of absenteeism and tardiness. Sixth,

Plaintiff had only been employed since February 21, 2005, and Jacque felt that an employee with a longer tenure would have a better chance of receiving a favorable outcome. Seventh, Jacque felt that the two arbitration awards in other cases produced by Callahan were more similar to Plaintiff's case than the ones he had cited, and he thought that an arbitrator would likely find the arbitration awards cited by U.S. Steel more persuasive.

On May 17, 2010, Jacque informed Plaintiff by letter that he withdrew Plaintiff's grievances because the facts and merits did not warrant further consideration through the grievance procedure.

In his Declaration, Jacque states, "When I told [Plaintiff] I would withdraw the grievances at the meeting I had with him and Williams, [Plaintiff] thanked me for all the work I had put into his case and told me I had done a good job." Union Br., Exh. W., ¶ 14.

## ANALYSIS

Plaintiff filed his claim in this case against the Union and U.S. Steel pursuant to section 301 of the Labor Management Relations Act, which "gives federal courts jurisdiction over suits to enforce the terms of collective bargaining agreements." *Nemsky v. ConocoPhillips Co.*, 574 F.3d 859, 864 (7th Cir. 2009) (citing 29 U.S.C. § 185). Because national labor policy encourages private rather than judicial resolution of disputes arising under collective bargaining agreements, litigation is considered a last resort for the resolution of these disputes. *See Bell v. DaimlerChrysler Corp.*, 547 F.3d 796, 803 (7th Cir. 2008) (citing *Republic Steel Corp. v. Maddox*, 379 U.S. 650, 652-53 (1965); *Vail v. Raybestos Prods Co.*, 533 F.3d 904, 908 (7th Cir. 2008)).

Plaintiff has sued the Union for breach of its duty of fair representation in handling his grievances and has sued his employer, U.S. Steel, for breaching the collective bargaining agreement. Such a suit is often referred to as a "hybrid" action, in which the two parts of the claim are "inextricably interdependent," meaning that a plaintiff must establish the claim against each defendant to prevail. *See, e.g., Reed v. United Transp. Union*, 488 U.S. 319, 328 (1989); *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 165 (1983) (citing *United Parcel Serv., Inc. v. Mitchell*, 451 U.S. 56, 66-67 (1981); *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 570-71 (1976)); *Nemsky*, 574 F.3d at 864. The Supreme Court has emphasized that the breach of fair representation claim must be analyzed prior to the breach of collective bargaining agreement claim, referring to the fair representation claim as an "indispensable predicate" to a section 301 claim. *Mitchell*, 451 U.S. at 62; *see also Thomas*, 890 F.2d at 915. Therefore, the Court first addresses the Union's Motion for Summary Judgment and will thereafter turn to U.S. Steel's Motion for Summary Judgment.

### A. The Union's Motion for Summary Judgment

The Supreme Court has likened a union's statutory duty of fair representation to that of a fiduciary, emphasizing that "[j]ust as . . . fiduciaries owe their beneficiaries a duty of care as well as a duty of loyalty, a union owes employees a duty to represent them adequately as well as honestly and in good faith." *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 75 (1991). "A union breaches its duty of fair representation only where its actions in pursuing a member's grievance are 'arbitrary, discriminatory, or in bad faith.'" *Truhlar v. U.S. Postal Serv.*, 600 F.3d 888, 892 (7th Cir. 2010) (quoting *O'Neill*, 499 U.S. at 67); *see also Vaca*, 386 U.S. at 190. Each possible basis for breach of the duty of fair representation is evaluated separately. *Garcia v. Zenith Elecs.,Corp.*, 58

F.3d 1171, 1176 (7th Cir. 1995) (citing *Griffin v. Airline Pilots Assoc.*, 32 F.3d 1079, 1083 (7th Cir. 1994)).

Whether "a union's actions are discriminatory or in bad faith calls for a subjective inquiry and requires proof that the union acted (or failed to act) due to an improper motive." *Neal v. Newspaper Holdings, Inc.*, 349 F.3d 363, 369 (7th Cir. 2003). The Union argues, and Plaintiff does not dispute, that Plaintiff has *not* alleged or raised a genuine issue of material fact as to an improper motive. Therefore, Plaintiff is not asserting discriminatory or bad faith conduct in the part of the Union. Rather, Plaintiff argues that the Union's actions were arbitrary.

The determination of whether a union's actions are arbitrary is an objective one. *Neal*, 349 F.3d at 369 (citing *McLeod v. Arrow Marine Transp., Inc.*, 258 F.3d 608, 613 (7th Cir. 2001)); *Trnka v. Local Union No. 688*, 30 F.3d 60, 63 (7th Cir. 1994)). "[A] union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness' as to be irrational." *O'Neill*, 499 U.S. at 67 (internal citation omitted). Courts have repeatedly emphasized that "the arbitrary prong of the fair representation analysis is very deferential." *Ooley v. Schwitzer Div., Household Mfg. Inc.*, 961 F.2d 1293, 1302 (7th Cir. 1992) (citing *O'Neill*, 499 U.S. at 66); *see, e.g., Garcia*, 58 F.3d at 1176 (referring to the standard as "quite forgiving"). Specifically, in reference to this deferential standard, the Seventh Circuit has stated:

> This wide degree of deference is warranted because Congress did not intend courts to interfere with the decisions of the employee's chosen bargaining representative. . . . Under this extremely deferential standard, courts should not substitute their judgment for that of the union, even if, with the benefit of hindsight, it appears that the union could have made a better call.

*Ooley*, 961 F.2d at 1302 (citing *O'Neill*, 499 U.S. at 78 (quoting *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338 (1953))) (internal citations omitted).

"[A]n employee cannot prevail on a fair representation claim based on the union's failure to process a grievance if the employee's claim lacks merit." *Id.* at 1304 (citing *Hines*, 424 U.S. at 570-71; *United Steelworkers v. NLRB*, 692 F.2d 1052, 1057 (1982); *NLRB v. Eldorado Mfg. Corp.*, 660 F.2d 1207, 1214 (7th Cir. 1981)). "[S]o long as a colorable argument could be made at the time of the union's decision to drop its support that the grievance is meritless (and the union did not then treat substantively similar grievances differently from the plaintiff's), the decision cannot be regarded as arbitrary." *Trnka*, 30 F.3d at 61. While "a union may not arbitrarily ignore a meritorious grievance or process it in a perfunctory fashion," an employee nevertheless does not have an "absolute right to have his grievance taken to arbitration regardless of the provisions of the applicable collective bargaining agreement." *Vaca*, 386 U.S. at 191.

In the case at bar, Plaintiff alleges in the Material Facts of his Complaint that his grievance was denied by U.S. Steel at step two despite his presentation of evidence confirming that Dr. Zabaneh had authorized him to return to work on July 24, 2009. He further alleges that, at the third step, he provided both U.S. Steel and the Union with written verification that he had been given permission by Dr. Zabaneh's office to change the return to work date on the Return to Work form and with cellular phone records confirming the call to Dr. Zabaneh's office from his friend Williams' phone. In Count I of the Complaint, Plaintiff alleges that the Union breached its duty of fair representation by failing to proceed with the arbitration of Plaintiff's grievances, that the processing of the grievances was done in a perfunctory manner, and that the outcome of his grievances was adversely affected by the poor quality of representation by the Union.

In its Motion for Summary Judgment, the Union asserts that there is no genuine issue of material fact and that the undisputed facts indicate that it is entitled to judgment as a matter of law as to Plaintiff's fair representation claim brought on the basis that the Union acted arbitrarily. To meet its burden on summary judgment, the Union has offered the Declaration of the Union representative, Alexander Jacque, who made the decision to withdraw Plaintiff's grievances and not to take Plaintiff's grievances to arbitration, as well as other exhibits to support Jacque's explanation for his decision.

As set forth above, Jacque provided seven reasons for his decision, each of which Plaintiff contests in his response brief in an effort to show that the decision to withdraw his grievances was so far outside the range of reasonableness as to be irrational. The Court disagrees. Although Plaintiff provides a different interpretation of each basis relied on by Jacque, a difference of opinion is not enough, and none of Plaintiff's interpretations render Jacque's beliefs so unreasonable as to be irrational. Plaintiff offers no evidence questioning Jacque's true belief of each basis or his belief that each reason would have affected the arbitration decision. The Court considers Jacque's reasons and Plaintiff's responses.

First, Jacque noted that U.S. Steel has a zero-tolerance policy for absences without cause, that he felt Plaintiff should have gone to the doctor on the first day he was off of work, and that the fact that he waited until the third day to go to the doctor, when he was already feeling better, made it difficult for Jacque to show that Plaintiff's absences were justified. When he was examined on July 22, 2009, Plaintiff had normal vital signs with some sneezing and congestion. In his response brief, Plaintiff does not contest U.S. Steel's zero-tolerance policy for absences without cause; instead, he argues that he did, in fact, have proper cause to miss work. Specifically, he notes that

he was ill, he called-in to notify U.S. Steel, he went to the doctor for his illness, and he got a doctor's note authorizing him to return to work, first for July 23, 2009, and then for July 24, 2009.  He also argues that the BLA does not require than an employee visit the doctor every time he is too ill to work.  At this stage of review, a potential factual dispute is not about whether Plaintiff was too sick to work; the issue is whether Jacque's decision not to take the grievances to arbitration was arbitrary. Although Plaintiff's explanation of his good cause for missing work appears valid at face value, the sequence of events and the circumstances surrounding them were considered by Jacque, as described in the following paragraphs, such that Jacque concluded that Plaintiff would have difficulty demonstrating at arbitration that he did in fact have good cause for his absences.

Jacque relied on evidence that Dr. Zabaneh's notes varied in regard to the symptoms listed, which Jacque believed made the notes less credible.  Although Plaintiff is correct that the Return to Work notes themselves did not differ as to symptoms; the first two Return to Work notes did not list symptoms but rather provided the reasons as "unable to work" and "still stick," and the November 17, 2009 note listed the symptoms as "dizziness and sinusitis."  However, these symptoms listed on the November 17, 2009 note did differ from the symptoms on the original July 22, 2009 examination notes, in which Plaintiff's symptoms were identified as congestion, sneezing, coughing, and sore throat.  While the symptoms are not inconsistent, they are not the same; the symptoms listed on the November 17, 2009 note are not included in the earlier July treatment record, which brings into question the veracity of the November 17, 2009 note.  Plaintiff argues that "[i]t is axiomatic that a doctor would not write the exact medical ailments that a patient has on a Return to Work Authorization."  Pl. Resp., p. 9.  The Court finds this argument illogical; what ailments *would* the physician write down on a Return to Work form other than the actual ailments from which

the patient suffered, especially if the ailments and/or symptoms are contained in the doctor's examination record.

Jacque also believed that the symptoms listed in the documents from Dr. Zabaneh's office may not have been severe enough to justify his absences from work, and the difference in the medical notes lessened the credibility of his symptoms. Plaintiff argues that Jacque is substituting his opinion for that of a medical professional and that Jacque is suggesting that he knows more about Plaintiff's medical condition than the doctor. However, it is Jacque's job as the Union representative to determine whether to pursue Plaintiff's grievances, which necessarily requires him to consider the presentation of the medical evidence in light of all the circumstances, including that U.S. Steel would challenge the severity of Plaintiff's illness and his belief that Plaintiff would not make a credible witness. Plaintiff brought only Williams as a witness to vouch for Plaintiff's illness, and Jacque believed that Williams' credibility was questionable because Williams came to the meeting with the odor of alcohol on his breath.

Plaintiff also challenges Jacque's determination that he and Williams would not make credible witnesses. Jacque asked Plaintiff why he did not go to the doctor on July 20, 2009, and Plaintiff responded that he was "too sick." Union Br., Exh. W., ¶ 11. Plaintiff argues that Jacque, as Plaintiff's advocate, acted in a grossly unreasonable manner in failing to ask Plaintiff more probing questions as to why he felt too sick to go to work. However, Jacque's summary of the conversation in his Declaration provides that Jacque also asked why Plaintiff did not go to the hospital and why, if he was so sick, did Plaintiff have three visitors at his house. Jacque also had the evidence of record regarding Plaintiff's physical symptoms and the prior notes and minutes of the grievance procedure in which Plaintiff had described his symptoms. Plaintiff had a full and fair

opportunity during the several times he and Jacque spoke to explain why he was sick from July 20, 2009, through July 23, 2009.[3] Plaintiff similarly accuses Jacque of being unreasonable by not asking Williams whether he had in fact been drinking. There could be many reasons why Jacque did not make further inquiry of Williams, including Jacque's certainty that Williams had been drinking. Plaintiff does not argue or suggest that Williams had *not* been drinking; nor does Plaintiff offer any evidence to bring into question Jacque's conclusion regarding Williams.

Finally, Plaintiff suggests that a reasonable advocate could have sought to identify other witnesses to testify in lieu of Williams. However, Jacque states in his Declaration that "[Plaintiff] told me that he could produce more evidence to prove his side of the story. [Plaintiff] told me that his wife and three other people were at his house during the days he was sick and he could produce them as witnesses. [Plaintiff] could only produce one person as his witness, Curtis Williams." Union Br., Exh. W., ¶ 10. Plaintiff offers no evidence or explanation to refute this testimony.

Although Dr. Zabaneh gave Plaintiff permission on July 23, 2009, to alter the return to work date on the July 22, 2009 note, Dr. Zabaneh did so without re-examining Plaintiff. Jacque believed that such evidence could diminish the doctor's credibility. Other than to argue for a different interpretation of the circumstances, Plaintiff offers no evidence that Jacque did not make these assessments or believe them or that this fact would come into play at arbitration.

One of the reasons Jacque gives for his decision was that there was no way to prove that Plaintiff made the call to Dr. Zabaneh's office on July 23, 2009, to obtain the authorization to change the original Return to Work note because the call was made from William's cell phone. On one hand Jacque is correct; there is evidence in the phone records that a call was made to Dr.

---

[3] Jacque states in his Declaration that he interviewed Plaintiff "several times while processing his grievance." Union Br., Exh. W., ¶ 12.

Zabaneh's office from William's phone but there is no way to show that Plaintiff himself made the call. On the other hand, Dr. Zabaneh's office confirmed that Plaintiff was given permission on July 23, 2009 to change the Return to Work note, so, unless Williams is also a patient of Dr. Zabaneh's and also called Dr. Zabaneh's office on July 23, 2009, it is hard to imagine who else would have called Dr. Zabaneh from Williams' phone or why it would matter whether it could be proved that Plaintiff himself made the call. Plaintiff reasons that Jacque could have called Plaintiff or Williams at arbitration to prove that Plaintiff made the call, but, again, Jacque felt that neither would make a credible witness. Calling someone from Dr. Zabaneh's office to testify would show that the office received a call asking for permission to change the Return to Work notice but would not necessarily be able to confirm that Plaintiff was the one who had made the call. Overall, the difference in interpreting this evidence does not remove Jacque's final decision from the realm of reasonableness in light of all the reasons given by Jacque for not pursuing the grievances.

Jacque states in his Declaration that he believed that Plaintiff's disciplinary history and length of employment would make it more difficult for him to succeed at arbitration. At the time of his suspension and subsequent termination, Plaintiff had worked for U.S. Steel for about four and a half years. Within the two years prior to his termination, Plaintiff received a five-day suspension for being absent without just cause as well as a written warning and a five-day suspension for two separate instances of tardiness. In his experience with union arbitration, Jacque believed that these were two more factors that weighed against Plaintiff. "Long service with the company, particularly if unblemished, is a definite factor in favor of the employee whose discharge is reviewed through arbitration." Elkouri & Elkouri, How Arbitration Works, Ch. 15.3.F.viii, p. 988 (6th ed., ABA

Section of Labor & Employment Law 2003).[4]  Similarly, "[a]n offense may be mitigated by a good

past record and it may be aggravated by a poor one." *Id*. at Ch. 15.3.F.vii, p. 983.[5]

In his response brief, Plaintiff acknowledges this disciplinary history but argues that it does

not constitute a "pattern" of absences and tardiness but rather a few isolated instances.  However,

Jacque offered in his Declaration that these factors would affect the arbitration decision, and Plaintiff

offers no evidence that a disciplinary record such as his, given his relatively short tenure, would not

be a factor taken into consideration at arbitration or that Jacque did not consider these factors or

truly believe their affect on the proceedings.  Plaintiff also argues that Jacque's statement that an

employee with a longer tenure would have a better chance at getting an arbitrator to rule in his favor

is simply a "general statement that could be made about any arbitration, and is highly speculative,

because there are no other arbitration awards with the same facts as [Plaintiff]."  Pl. Resp., p. 11.

Again, Plaintiff fails to draw into question the truth of Jacque's belief that tenure is a factor in

arbitration decisions or that tenure does in fact play that role.

Jacque also considered the two arbitration decisions from other cases that Callahan, counsel

for U.S. Steel, produced prior to arbitration.  Jacque states in his Declaration that he felt that those

decisions were more similar to Plaintiff's situation than the two arbitration decisions he had cited

in his brief.  He also believed that the arbitrator would find the decisions cited by U.S. Steel more

persuasive.  Plaintiff argues that the two arbitration decisions do not have facts similar to Plaintiff's.

---

[4] In the 2010 Supplement, the section has been renumbered as heading "ix," and the text provides: "Longevity of employment remains a significant mitigating factor because the employee is thought to have built up equity in his or her job."  Elkouri & Elkouri, How Arbitration Works, Ch. 15.3.F.xi, p. 363 (6th ed., ABA Section of Labor & Employment Law 2003) (2010 cumulative supplement).

[5] In the 2010 Supplement, the section has been renumbered as heading "viii," and the text provides: "Arbitrators continue to consider grievants' past records as mitigating or supporting contested discipline."  Elkouri & Elkouri, How Arbitration Works, Ch. 15.3.F.viii, p. 362 (6th ed., ABA Section of Labor & Employment Law 2003) (2010 cumulative supplement).

Plaintiff is correct that neither of the two decisions identified by Callahan are identical to his factual situation and that in some aspects, the conduct of each grievant was worse than his. However, in his Declaration, Jacque provides a summary of those two decisions and explains why he feels that they are *more similar* to Plaintiff's situation (not that they are identical), noting:

> In [the first decision], the employee had been discharged for failure to work as scheduled and submitting fraudulent documents. That employee had twelve years of service with U.S. Steel, turned in an altered doctor's note for an absence of one day, obtained additional doctor's notes to substantiate his absence; his discharge was upheld. In [the second decision], the employee was discharged for being absent without cause. The employee's diagnoses kept changing and his discharge was upheld. These two decisions were more on point than the decisions I cited to in my brief because the facts were more similar to [Plaintiff's]. Namely, in U.S. Steel's arbitration awards, the employees had less seniority, less severe illnesses, and less prior discipline than the ones in the awards I cited to. I thought an arbitrator would find the arbitration awards cited to by U.S. Steel more persuasive.

Union Br., Exh. W, ¶ 13. In his response brief, Plaintiff distinguishes the facts of those two cases from his, but those precise distinctions are not material. What is material is Jacque's perception of those decisions as more analogous to Plaintiff's situation. The Court concludes from its review of those two decisions as well as one of the decisions that Jacque originally cited[6] that Jacque's interpretation of the decisions was not irrational or without merit. Differences of opinion regarding Jacque's judgment does not establish a breach of a Union's duty of fair representation.

The Court is not concerned with whether other advocates would have came to a different conclusion. Rather, the Court is concerned with whether the Union's decision, and specifically Jacque's decision, to withdraw Plaintiff's grievances was made rationally and in good faith. *See Neal*, 349 F.3d at 369; *Reed v. Int'l Union of United Auto., Aerospace & Agr. Implement Workers of Am.*, 945 F.2d 198, 202 (7th Cir. 1991) (explaining that a "union is not obliged to pursue all

---

[6] *See infra* note 2.

grievances to arbitration: it may withdraw or settle a grievance based upon its good faith evaluation of the merits"). When taken as a whole, the factors considered by Jacque confirm that the Union acted reasonably. Jacque considered the credibility of the evidence, the credibility of the witnesses, Plaintiff's length of service and disciplinary history, and past arbitration decisions. In light of the highly deferential standard, the Court finds that the Union conducted an adequate investigation and that the decision not to pursue Plaintiff's grievances was well within a "wide range of reasonableness" and, thus, was not arbitrary such that the Union did not breach of its duty of fair representation.

Finally, in paragraph 26 of his Complaint, Plaintiff alleges that the Union's actions in processing his grievances were "negligent." Compl. ¶ 26. However, "mere negligence" is not enough to support a showing of breach of the duty of fair representation. *United Steelworkers of America v. Rawson*, 495 U.S. 362, 372-73 (1990).

Therefore, the Court grants the Union's Motion for Summary Judgment.

## B. U.S. Steel's Motion for Summary Judgment

The Supreme Court has recognized that an employee may bring suit against his employer for breach of a collective bargaining agreement. *See Smith v. Evening News Ass'n*, 371 U.S. 195, 200-01 (1962). Typically the employee is first required to attempt to exhaust any grievance or arbitration remedies provided in the collective bargaining agreement. *Maddox*, 379 U.S. at 652. However, the Supreme Court has provided an exception to the general rule, allowing an employee to bypass the requirement when bringing suit against his union and employer under § 301. *See Clayton v. Auto. Workers*, 451 U.S. 679, 696 (1981). As mentioned above, once an employee brings suit against his union and employer under § 301, he bears the burden of proving *both* parts of the

claim to ultimately succeed at trial. *See Reed*, 488 U.S. at 328; *DelCostello*, 462 U.S. at 165; *Nemsky*, 574 F.3d at 864. Regardless of the merits of the claim, Plaintiff's collective bargaining claim against U.S. Steel fails because his fair representation claim against the union has not survived summary judgment. *See Crider v. Spectrulite Consortium, Inc.*, 130 F.3d 1238, 1241 (7th Cir. 1997) (recognizing that "neither claim is viable if the other fails"). Consequently, the Court grants U.S. Steel's Motion for Summary Judgment.

### C. Motion to Strike

In the Motion to Strike, the Union first asks the Court to strike Plaintiff's May 15, 2012 response to the Union's Motion for Summary Judgment. The Union filed a Motion for Summary Judgment and brief in support on April 2, 2012. Plaintiff's response was due on April 30, 2012. Plaintiff requested an extension of the deadline, and the Court granted the request, extending the deadline to May 14, 2012. Plaintiff filed his Response on May 15, 2012, at 12:26 a.m. eastern standard time, which is 11:26 p.m. central standard time, and Plaintiff filed his Brief in support shortly thereafter at 12:28 a.m. eastern standard time, which is 11:28 central standard time. The Hammond Division of the Northern District of Indiana is in the central standard time zone. The CM/ECF User Manual provides that the deadline for filing is 11:59 p.m. eastern standard time. Therefore, Plaintiff's response brief was 27 minutes late. Although the Union is correct that Plaintiff's brief was untimely, in the interests of justice, the Court denies the request to strike Plaintiff's entire response brief on this basis.

In the alternative, the Union asks the Court to strike Plaintiff's Affidavit, which is attached to the response brief, invoking Federal Rule of Civil Procedure 37(d). Rule 37(d) provides:

> **(d) Party's Failure to Attend Its Own Deposition, Serve Answers to Interrogatories, or Respond to a Request for Inspection.**

**(1)** *In General.*

**(A)** *Motion; Grounds for Sanctions*. The court where the action is pending may, on motion, order sanctions if:

**(i)** a party . . . fails, after being served with proper notice, to appear for that person's deposition; or

**(ii)** a party, after being properly served with interrogatories under Rule 33 or a request for inspection under Rule 34, fails to serve its answers, objections, or written response.

**(B)** *Certification*. A motion for sanctions for failing to answer or respond must include a certification that the movant has in good faith conferred or attempted to confer with the party failing to act in an effort to obtain the answer or response without court action.

**(2)** *Unacceptable Excuse for Failing to Act.* A failure described in Rule 37(d)(1)(A) is not excused on the ground that the discovery sought was objectionable, unless the party failing to act has a pending motion for a protective order under Rule 26(c).

**(3)** *Types of Sanctions.* Sanctions may include any of the orders listed in Rule 37(b)(2)(A)(i)-(vi). Instead of or in addition to these sanctions, the court must require the party failing to act, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust.

Fed. R. Civ. P. 37(d).

Federal Rule of Civil Procedure 30(b)(1) sets forth the method of giving notice of a deposition:

**(1)** *Notice in General.* A party who wants to depose a person by oral questions must give reasonable written notice to every other party. The notice must state the time and place of the deposition and, if known, the deponent's name and address. If the name is unknown, the notice must provide a general description sufficient to identify the person or the particular class or group to which the person belongs.

Fed. R. Civ. P. 30(b)(1).

On December 13, 2011, counsel for the Union scheduled Plaintiff's deposition for January 10, 2012, by letter to the other counsel of record. The letter from counsel for the Union confirming the deposition provides that he would circulate a formal notice once he received the room designation for the deposition. On January 6, 2012, counsel for the Union sent an email to the other attorneys of record, confirming their conversations from that afternoon in which they agreed to *cancel* Plaintiff's deposition that had been set for January 10, 2012.

In a subsequent letter to Plaintiff's counsel,[7] counsel for the Union wrote: "You were unable to reach your client in time to assure the other parties that it was possible for the deposition to go forth on January 10, as scheduled. As a consequence, given the fact that two of the lawyers were traveling from Pittsburgh, we canceled the deposition." Union Br., Exh. BB., p. 3. The letter further provides: "Our understanding is that [Plaintiff] now lives in Ohio and that he is working. We request that you determine when he might be available for his deposition. We will then proceed to schedule. [S]ince the discovery cut-off in this case is February 20, 2012, it is important to do this as soon as possible." *Id.* The letter concludes, "If your client does not cooperate in scheduling his deposition, we will seek to have the case dismissed." *Id.*

On February 1, 2012, counsel for the Union wrote to counsel for Plaintiff offering dates of February 9, 2012, and February 15-17, 2012, as available for the deposition of Plaintiff. The Union represents in the instant motion that counsel for Plaintiff did not respond to this request. There is no other evidence of a deposition notice in the record. The Union did not file a motion to compel

---

[7] The letter is dated December 13, 2011. However, the letter shows that it was received by the U.S. Steel legal department on January 17, 2012. Given the sequence of events regarding the deposition scheduling, it appears that the date on the letter is incorrect. The Union offers no explanation for this apparent error.

Plaintiff's deposition. *See Control Solutions LLC v. Oshkosh Corp.*, No. 10 C 121, 2012 WL 3096678, *2 (N.D. Ill. July 7, 2012).

The Union also represents in this Motion to Strike that it served Interrogatories and a Request for Production of Documents on Plaintiff.[8] However, the Union does not make any other assertion regarding this discovery. Notably, the Union does not assert that Plaintiff failed to respond to this written discovery. Rather, after noting that it served written discovery, that Plaintiff cancelled his January 10, 2012 deposition, and that the Union made other attempts to schedule Plaintiff's deposition without response from Plaintiff, the Union makes the broad statement that Plaintiff "has blatantly ignored his discovery responsibilities but seeks to have his Affidavit added to the record." Union Mot. to Strike, p. 2. The Union then asks for the Affidavit to be stricken as a sanction under Rule 37(d).

The Court finds that a sanction under Rule 37(d) is not warranted because Plaintiff did not fail to appear for a properly noticed deposition. The deposition that was noticed for January 10, 2012, was cancelled by agreement of the parties, and no further deposition notice was issued despite counsel's attempts to coordinate a deposition date. The Union also has not argued that Plaintiff failed to respond to written discovery. Therefore, the Court denies the Motion to Strike.

However, the Court notes that it did not rely on Plaintiff's Affidavit. With one exception, Plaintiff did not cite the Affidavit in his Response Brief to the Union's Motion for Summary Judgment. The only citation by Plaintiff to the Affidavit is at the second citation in a string cite after a sentence in the section titled "Additional Material Facts." *See* Pl. Resp., p. 5. The first cite

---

[8] Notably, the Union cited these written discovery requests in support of its Motion for Summary Judgment but failed to attach them to the motion. The Union provides them to the Court for the first time in support of this Motion to Strike.

for that material fact is to Union's Exhibit S, which fully supports the material fact. Plaintiff does not cite the Affidavit in support of any other facts in the Additional Material Facts or in his Argument. Therefore, it is unnecessary for the Court to rely on Plaintiff's Affidavit.

## CONCLUSION

For the foregoing reasons, the Court hereby **DENIES** the Union Defendants' Motion to Strike Plaintiff's Response to Union Defendants' Motion for Summary Judgment [DE 37], **GRANTS** the Union Defendants' Motion for Summary Judgment [DE 23], and **GRANTS** the Motion for Summary Judgment of United States Steel Corporation [DE 24].

The Court **DIRECTS** the Clerk of Court to enter judgment in favor of (1) Defendant United States Steel Corp.; (2) Defendant United Steel Workers, Local 1014; and (3) Defendant United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, and to enter judgment against Plaintiff Mohammad I. Ibrahim.

SO ORDERED this 15th day of August, 2012.

s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc:    All counsel of record